JMK:ALC/TS
F. #2014R01614

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

CHRIS MESSALAS,
BORIS RUBIZHEVSKY,
MICHAEL GARNICK,
DIMITRIOS ARGYROS,
          also known as "Jimmy," ███████

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

17M321

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(18 U.S.C. §§ 371, 1956(h))

EASTERN DISTRICT OF NEW YORK, SS:

CHRISTOPHER M. DONOHUE, being duly sworn, deposes and says that he is a

Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law

and acting as such.

Upon information and belief, in or about and between October 2015 and April

2017, both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY and MICHAEL

GARNICK, together with others, did knowingly and willfully conspire to use and employ

manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and

Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal

Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b)

making untrue statements of material fact and omitting to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in BioCube, Inc. ("BioCube"), a publicly traded company, in connection with the purchase and sale of investments in BioCube, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY and MICHAEL GARNICK, together with others, committed and caused to be committed overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

Upon information and belief, in or about and between October 2015 and April 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHRIS MESSALAS, DIMITRIOS ARGYROS, also known as "Jimmy," and ████████████████ together with others, did knowingly and willfully conspire:

a. to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(A); (ii) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code,

2

Section 1956(a)(2)(B)(i); and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii).

      b.    to conduct financial transactions affecting interstate and foreign commerce, specifically the international wire transfer of money and securities, which transactions involved property represented by a cooperating witness ("CW") acting under the direction of a federal law enforcement officer authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, specifically, fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, (i) with the intent to promote the carrying on of such specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(3)(A); (ii) to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(3)(B); and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(3)(C).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

Upon information and belief, on or about February 25, 2016, within the Eastern District of New York and elsewhere, the defendant                 together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, specifically, fraud in the sale of securities.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

3

## INTRODUCTION

The source of your deponent's information and the grounds for his belief are as follows:

1.      I have been employed by the FBI for approximately 20 years.  I have been a Special Agent with the FBI for approximately 16 years.  I am currently assigned to an FBI squad which investigates securities fraud, wire fraud, money laundering and other financial crimes.  During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information.  During the course of certain of these investigations, I have served as the lead investigator in the investigation and prosecution of persons involved in securities fraud, among other crimes.

2.      I have personally participated in the investigation of securities fraud conspiracy and money laundering conspiracy by the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY, MICHAEL GARNICK, DIMITRIOS ARGYROS, also known as "Jimmy," and ███████████████ among others, as discussed below.  I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents, (c) my review of consensual recordings, (d) discussions with a cooperating witness (the "CW")[1] and my

---

[1]      The CW pled guilty to wire fraud pursuant to a cooperation agreement.  He is currently cooperating in hopes of receiving leniency at sentencing (and has not yet been sentenced).  His information has been corroborated by other evidence obtained during the course of this investigation including, but not limited to, the consensual recordings he has made.

4

review of consensually recorded conversations and meetings, and documents provided by the CW, (e) my review of four judicially-authorized wiretaps and emails obtained through judicially-authorized search warrants, and (f) bank records and public records, among other sources of evidence.

3.      Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents.   Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY, MICHAEL GARNICK, DIMITRIOS ARGYROS, also known as "Jimmy," and ███████████████ I have not set forth each and every fact learned during the course of this investigation.   Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrants sought herein.   In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part.

## PROBABLE CAUSE

### I.   Background

#### A.   Relevant Regulatory Principles and Definitions

4.      The term "beneficial owner" was defined under the rules of the United States Securities and Exchange Commission (the "SEC").   It included any person who directly or indirectly shared voting power or investment power (the power to sell a security).   When a person or group of persons acquired beneficial ownership of more than five percent of a voting

---

communications intercepted pursuant to judicially-authorized wiretaps, surveillance evidence and documentary evidence, including bank records and telephone records.

class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), they were required to file a Schedule 13D with the SEC. Schedule 13D reported the acquisition and other information within 10 days after the purchase. The schedule was filed with the SEC and was provided to the company that issued the securities and each exchange on which the security was traded. Any material changes in the facts contained in the schedule required a prompt amendment. When a person or group of persons acquired more than five percent but less than 20 percent of a company's equity securities registered under Section 12 of the Exchange Act and did not acquire such securities with a purpose or effect of changing or influencing control of the issuer or in a transaction having that effect, they may file a Schedule 13G with the SEC in lieu of the Schedule 13D.

5.     An "affiliate" of a publicly traded company generally referred to a person, such as an executive officer, director or large shareholder, in a relationship of control with the issuer of securities. Affiliates were required to abide by certain rules in selling stock. One such rule, contained in Rule 144 of Section 5 of the Securities Act of 1933 ("Securities Act"), was that an affiliate cannot sell more than one percent of the relevant class of the company's outstanding shares in a 90-day period. Based on my training and experience, a person who owned or controlled 10 percent or more of a company's stock was commonly understood as being an affiliate of the company.

6.     The term "nominee" in the securities fraud context referred to a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the customer as the actual owner. A "nominee account" was a type of account in which a stockbroker held shares belonging to clients in the name of a sham

entity or another individual.   The use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer.

7.      "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization.   Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges.   Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

8.      The term "pink sheets" referred both to daily publications compiled by the National Quotation Bureau with bid and ask prices of over-the-counter ("OTC") stocks and OTC trading itself.   Based on my training and experience, I am aware that, unlike companies on a stock exchange, companies quoted on the pink sheets system do not need to meet certain minimum requirements or file with the SEC.

9.      A "pump and dump" scheme was a scheme where a group of individuals who control the free trading or allegedly unrestricted shares, also referred to as the "float," of a microcap company fraudulently inflated the share price and trading volume of the targeted public company through, inter alia, wash and matched trades, false and misleading SEC filings, press releases and paid stock promotions.   When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

10.      Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of

Company A through Broker B.   Matched trades were similar to wash trades but involved a related third person or party who placed one side of the trade.   For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker.   Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

11.   Based on my training and experience, offshore companies have historically been used by individuals to facilitate securities fraud, money laundering and tax evasion.   Specifically, individuals committing securities fraud often launder illegal stock proceeds (usually derived by stock manipulation or false disclosure schemes), conceal their ownership of large percentages of stock of public companies in violation of federal securities laws, and manipulate the trading of public companies by trading in an illicit fashion through accounts maintained in the names of these offshore entities.   Stock fraudsters have traditionally used offshore entities to trade securities on their behalf in the public market, allowing the fraudsters to conceal their involvement in the trading and manipulation of the securities for their benefit.

12.   The Foreign Account Tax Compliance Act ("FATCA") is a federal law enacted in March 2010 that targeted tax non-compliance by U.S. taxpayers with foreign accounts.   FATCA requires U.S. persons to report their foreign financial accounts and offshore assets.   Additionally, FATCA requires foreign financial institutions to report to the Internal Revenue Service ("IRS") certain financial information about accounts held by U.S. taxpayers or foreign entities in which U.S. taxpayers hold a substantial ownership interest.

B.    **The Defendants and Relevant Entities**

13.    The defendant CHRIS MESSALAS, a resident of Staten Island, New York, formerly was a securities trader and one of the principal owners of LeadDog Capital Markets, LLC, formerly known as LeadDog Capital Partners, Inc. ("LeadDog"), a hedge fund that focused on microcap public companies.   In or about 2005, MESSALAS settled a customer complaint with the National Association of Securities Dealers ("NASD") alleging that he made misrepresentations and omissions in relation to unsuitable investments in penny stocks, and paid $45,000 in the settlement.   In approximately late 2012, the SEC sanctioned MESSALAS, LeadDog and LeadDog's general counsel for violating the antifraud provisions of the federal securities laws by making material misrepresentations and omissions to investors and potential investors in a hedge fund, including omissions relating to MESSALAS's disciplinary history in the securities industry.   The SEC also barred MESSALAS from association with any broker, dealer, or investment adviser and permanently prohibited him from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

14.    The defendant BORIS RUBIZHEVSKY, a resident of Closter, New Jersey, served as the Director and Chief Executive Officer ("CEO") of BioCube from approximately August 2009 to November 2014.   RUBIZHEVSKY held management positions in companies in which MESSALAS or LeadDog was an investor.

15.    The defendant MICHAEL GARNICK, a resident of Philadelphia, Pennsylvania, was an attorney and the Managing Member of Admetus Capital Group LLC.

9

16.     The defendant DIMITRIOS ARGYROS, also known as "Jimmy," a resident of Paramus, New Jersey and currently residing temporarily in Cyprus, was a professional anti-money laundering consultant.   ARGYROS is also the defendant CHRIS MESSALAS's cousin.

17.     The defendant ███████████████ a citizen of Cyprus and resident of ███████████ was an offshore incorporator and the Chief Executive Officer of ███████, a company based in ██████ Cyprus, that marketed itself on its website as providing "international tax planning, trustee and company administration services."   In addition, based on my participation in this investigation, I am aware that ███████████ does business through ████████ (which also appears to use the name ████████████████ ), a company purportedly based in Dubai, United Arab Emirates.

18.     BioCube, with its purported principal place of business in Phoenix, Arizona, was a public company incorporated on or about July 30, 2007 as Greenleaf Forest Products, Inc., whose business was identified in filings with the SEC, in sum and substance, as the importation of pine wood blocks from Brazil and Argentina that were used for civil architecture purposes.   Since approximately 2010, BioCube has purported to have a series of different business purposes.   In BioCube's last quarterly report, a Form 10-Q, which was filed with the SEC on or about February 11, 2015 and applied to the quarterly period ending on or about April 30, 2013, BioCube identified its business as "to market and distribute Li-ion batteries in North America."   Since approximately July 2014, two of BioCube's independent auditors have been dismissed, with the most recent auditor's dismissal occurring on or about June 7, 2016.   Shortly thereafter, on or about August 11, 2016, BioCube filed a Form 15 with the SEC that served as BioCube's certification that its common stock was held of record by fewer than

10

Exchange Act Rule 12g-4(a)(1)'s threshold number of persons, and its notice that, on that basis,

BioCube was terminating its common stock's registration and its duty to file reports with the

SEC.   In its subsequent OTC pink sheets disclosure, filed in amended form on December 19,

2016, BioCube stated that it had 64,342,700 common shares outstanding as of December 19,

2016, and summarized its business operations as follows:

> BioCube, Inc. (the "Company") is a technology company with a focus on environmental and technical infrastructure projects related to homeland security, renewable energy and clean technologies. The Company through its majority-owned subsidiary IUT Technologies Inc. ("IUT") plans to market and distribute in North America devices for the detection of THC and marijuana on a user's breath; devices for industrial and environmental monitoring; and other devices for solutions in homeland security and building protection based upon trace gas analyzers. The Company previously had operated several other marketing and distribution businesses for electrical surge protection devices; aerosol based decontamination systems; and batteries utilizing a proprietary and patented process. These businesses were terminated as each new venture was commenced.

19.     Institut für Umwelttechnologien GmbH ("IUT Medical"), with its

purported principal place of business in Berlin, Germany, was a company organized under

German law that, among other things, marketed itself as developing explosives detection

technology.   On August 22, 2014, BioCube filed a Form 8-K with the SEC stating that it had a

Letter of Agreement with IUT Medical regarding a marijuana detecting device.   The 8-K

identified the defendant BORIS RUBIZHEVSKY as BioCube's Chief Executive Officer.   On or

about February 10, 2015, BioCube filed a Form 8-K with the SEC attaching a Joint Venture

Agreement stating that IUT Medical and BioCube were to form a new company named IUT

Technologies in order to market a marijuana detector.

20.     IUT Technologies Inc. ("IUT Technologies"), with its purported principal place of business in Florham Park, New Jersey, was incorporated in New Jersey on or about December 17, 2014.

21.     Blackwater Capital Markets Limited ("Blackwater"), with its purported principal place of business in New York, New York, was registered with the New York State Department of State on or about March 27, 2014.   The address of Blackwater provided in connection with Blackwater's registration was the same as that of the defendant CHRIS MESSALAS's residence.   As of approximately February 3, 2015, Blackwater marked itself on its website as "a specialized Family Office" based in New York, "investing in a broad range of strategies which include distressed debt, convertible debentures, straight equity, bridge and mezzanine financing, reverse mergers and equity listings on numerous exchanges with Global reach in Athens, Luxembourg, New York, Paris, London, Zurich, Geneva, Frankfurt, Dubai, Hong Kong, and Singapore."   A GoDaddy.com domain name search in or about January 2016 revealed that the domain name for Blackwater's website is registered to the defendant CHRIS MESSALAS.

22.     Admetus Capital Group LLC ("Admetus Capital"), with its purported principal place of business in Philadelphia, Pennsylvania, was created on or about February 27, 2015.   According to a Schedule 13G, filed with the SEC on or about October 14, 2015, Admetus Capital was the owner of 5,250,000 shares of BioCube.   The foregoing Schedule 13G was signed electronically by the defendant MICHAEL GARNICK as "Managing Member."

## II.   The BioCube Manipulation Scheme

23.     In or about and between October 2015 and April 2017, the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY and MICHAEL GARNICK, together with

others, engaged in a scheme to defraud investors and potential investors in BioCube by concealing MESSALAS's beneficial ownership and control of BioCube's shares.  MESSALAS, RUBIZHEVSKY and GARNICK engaged in this scheme because MESSALAS wanted to exercise control over the price and trading of BioCube's stock.

24.   Beginning in or about 2015, the CW began meeting and speaking with the defendant CHRIS MESSALAS and consensually recorded their conversations, all at the direction of the FBI.  In approximately the fall of 2015, the CW began meeting and speaking with the defendants DIMITRIOS ARGYROS, also known as "Jimmy," and ████████████ ████████████ and consensually recorded their conversations, also at the direction of the FBI.

25.   On or about October 14, 2015, the CW consensually recorded a telephone call with the defendant CHRIS MESSALAS at the FBI's direction.   The telephone call included the following conversation,[2] in which MESSALAS admitted to drafting and filing the Schedule 13G with the SEC signed by the defendant MICHAEL GARNICK, relating to the ownership of BioCube stock by Admetus Capital:

CM:   I had to file a 13G. I filed a 13G yesterday.

CW:   What is that?   Is that for ownership with no intent?

CM:   Yeah, I have over five . . . you know, one of the companies that I deal with has over five percent of BioCube so I had to file a 13G before I deposited the stock.  So then I deposited, what do you call it, the 13G came out this morning.  I just finished up the paperwork to deposit the stock.  It's such a fucking pain in the ass, I can't take it.

---

[2]   Summaries and transcripts of recorded conversations contained herein are in draft form and are subject to revision.

13

CW: So, now let me ask you a question, when you file a 13G under the corporate name, you use your name to do it all?

CM: No. No. No. No.   What do you call it, the managing, I'm just.   It's not even me.   My trust is a partner and the managing member signs.

CW: Oh, that guy, Michael something.

CM: Yeah, Michael Garnick.   He's the managing partner, he signs everything, but I have to do all the fucking paperwork.   And then when I do the paperwork, he reviews it and signs it all.

26.    On or about October 29, 2015, the CW consensually recorded another telephone call with the defendant CHRIS MESSALAS at the FBI's direction.   MESSALAS told the CW during this call, in pertinent part, that BioCube stock had a "stop sign" on it.   Based on my training and experience, I believe that the term "stop sign" referred to a symbol used on the OTC Markets quotation system that identified to users that the listed company was not up to date with its filings.   MESSALAS stated that he would have to file a Form 8-K with the SEC so that he could deposit BioCube stock.   MESSALAS also said that BioCube owned a "pot detector," which would purportedly identify someone's recent use of marijuana based on a breath test, and that he intended to showcase the "pot detector" at some point.   When the CW asked MESSALAS about the timing of such a promotion, MESSALAS said, in pertinent part: "I don't want to do it.   Obviously, there's no reason to do it unless all my stock is in the place where it's gotta be.   You know, I'm not doing this for my health."   Later in the call, MESSALAS stated that he held less than 9.9 percent of BioCube's stock in his own name.   MESSALAS further

stated: "That's why I filed Admetus. Admetus is not owned by me, it's owned by one of my trusts."

27. The next day, on or about October 30, 2015, the CW consensually recorded another telephone call with the defendant CHRIS MESSALAS at the FBI's direction. During the call, MESSALAS stated that he wanted to have a game plan for BioCube. Specifically, MESSALAS discussed his desire to have BioCube listed on multiple exchanges and to promote it outside of the United States. MESSALAS said, in pertinent part, that "the Canadians" would handle the marketing side. MESSALAS further stated that the promoters take 30 percent of whatever they sell. MESSALAS said that he had paid up to 70 percent of total profits for a past stock promotion. MESSALAS also stated that he would not use promoters in the United States because there were too many regulations.

28. On various dates in approximately October and November 2015, at the direction of the FBI, the CW consensually recorded telephone calls with the defendant CHRIS MESSALAS, in which they discussed, inter alia, the CW's prospective purchase of BioCube stock. On or about October 22, 2015, the CW consensually recorded a telephone call with the defendant CHRIS MESSALAS at the FBI's direction in which, inter alia, MESSALAS and the CW discussed the possibility of MESSALAS's transferring BioCube shares to the CW via a matched trade. MESSALAS asked the CW, "you're on the bid?", which I believe, based on my training and experience, was a reference to the CW's having placed an order for BioCube stock at a specific price. When the CW responded that he would check to confirm that he was "on the bid", and said "they were at five cents," MESSALAS said, "well make sure 'cause I don't want to hit the fucking bid and nobody be there." Based on my training and experience, I believe that MESSALAS was referring to his selling BioCube shares at the price of five cents per share via a

matched trade.   In or about November 2015, rather than following through on a matched trade, the CW and MESSALAS agreed that MESSALAS would sell BioCube shares to the CW through a private sale.

29.     On or about November 27, 2015, the CW consensually recorded another telephone call with the defendant CHRIS MESSALAS at the FBI's direction.   During this call, MESSALAS and the CW arranged to meet in person on December 1, 2015.   MESSALAS told the CW to bring a bank check for $25,000 made out to Blackwater for the purchase of BioCube shares.   After MESSALAS and the CW discussed the fact that the CW did not yet have an account into which to deposit stock, MESSALAS stated: "I will give you a stock purchase agreement signed by me and Blackwater, ok?   And then you just fill in the name and we figure out what the name is.   I have the cert sitting right here, so it's not going to be a problem." Based on my training and experience, I believe "cert" was a reference to a stock certificate, i.e., the physical piece of paper representing ownership of a company's equity.

30.     Also on or about November 27, 2015, the defendant CHRIS MESSALAS sent the CW an email with the subject line, "this is agreement take a look," attaching a document entitled "stock purchase bicb []."   The document, entitled "Securities Purchase Agreement," was dated "December 01, 2015" and stated that it was between "Blackwater Capital Markets Limited (The "Seller")," and a "Purchaser" with the name left blank.   The agreement stated, in pertinent part, that "[t]he number of Shares will be 850,000 (eight Hundred and fifty)," and "[t]he total Purchase Price will be $25,000 (Twenty five thousand US dollars)."

31.     On or about December 1, 2015, the CW consensually recorded his meeting with the defendant CHRIS MESSALAS at the FBI's direction.   Prior to the meeting, the FBI provided the CW with a bank check in the amount of $25,000, made out to Blackwater.

16

At the meeting, pursuant to the FBI's direction, the CW provided that bank check to

MESSALAS.   During the course of the meeting, MESSALAS and the CW discussed the

scheme to manipulate the price of BioCube stock, as follows:

CW:   So right now you own BioCube shares.

CM:   [Nods] I'll tell you exactly the deal.   I have uh – Boris has debt.

CW:   Boris has debt?

CM:   It's a million dollars.   The only reason it's a million dollars is he hasn't get paid in four years—

CW:   Right.

CM:   Ok?   And half that is mine.

CW:   Yours.

CM:   [Nods] So now what I was planning was exercise a little bit and cancel the rest.

CW:   And that will be your shares.

CM:   What?

CW:   That will be your shares.

CM:   Right.   Either way I'm not losing.

. . . .

CW:   So let's talk about this deal. So, you have everything locked as far as BioCube is concerned, know where everything…you control it.

CM:   I don't control it, but I know…listen, in the float, my partners, they own the whole fucking, they own the whole thing.

CW:   Where are the shares?

CM:   In their accounts.   But the great thing about my guys is, that once this thing starts trading, they're gonna buy, they're

17

nuts, ok, they're gonna start buying it, and they own it at higher prices anyway. I did a massive PR that went to 18 cents, traded 10 million shares a day.

CW:   When was that?

CM:   Like three years ago, so there are guys who own it at higher prices, there are guys who average down.

CW:   But when you really start to run this thing, where do you think, you think it's going to go...75, 80, a dollar?

CM:   Being conservative, let's say 20.

CW:   20 cents?

CM:   Let's be conservative....25 but as I said before, you can't control it, look at the way it trades, it don't fucking trade.

CW:   I looked at the last one, that eMONE thing, this is same guys?

CM:   No, I'm using a different group.

CW:   A different group? 'Cause that eMONE thing worked well when you used them.

CM:   Yeah, but look they did it again, but they ran it up to 2 and a half, it got crushed, because the CEO wasn't working with them because he was a dick, he wouldn't put out any announcements.

CW:   When they wanted him to?

CM:   Right, so they just ran it and they said "fuck you, I don't care what you say."

CW:   Because they had their shares.

CM:   Right, so they got out with 4 or 5 million (UI).[3]

. . . .

CM:   BioCube, I'm using totally different guys.

---

[3]   "(UI)" denotes unintelligible.

18

CW:    Are they good though?

CM:    Yeah, they're fucking awesome, and with this story they're gonna go crazy.

CW:    So it's gonna go higher than 20 cents.

CM:    I'm being conservative.

CW:    Here's my concern. We do this deal. You . . . Look, my name is not on the con, whatever, you tell me when to sell it, by the time ███████ ████████████] sets up what he got to set up.

CM:    No matter what me and you do, it's guaranteed, God forbid, this blew up, and BioCube went to zero, it's my fucking onus to take care of you, obviously you would have to take care of me, vice versa. . . . We got to talk about what you want to do.

CW:    So ████████ ████████████] is going to do his thing.

CM:    Here's the question, we have to get this out in the open. You're not an SEC agent, you're not a policeman, you're not nothing. Ask me that same question.

CW:    Are you an SEC agent?

CM:    No.

CW:    Are you a policeman?

CM:    No.   A federal agent?

CW:    No, are you?

CM:    No, ok, so let's get this out.... I'd have to imagine, the relationship we have, you trained me in the business, ok, I just wanna, we gotta get it out in the open. Now, what is he going to do, he's gonna basically let you use him....

CW:    My understanding with [████████████ is, setting up an account, over there, over in Europe, my name's not going to appear on it.

CM:    It's going to be his company.

19

CW: He's got something set up already.

CM: He's already got a few—

CW: He's got a few things set up, that he's going to set up a bank account and brokerage account, that gives me access somehow to the trading.

CM: He's going to do it the way that I taught him. You get an info@.[4]

CW: info@, that's what [            ] told me, I send him instructions. So that's going to be set up. I'm going to wire him some money, tonight or tomorrow. Oh, his travel, you know what, he wanted to come like tomorrow, it's too crazy, but sometime in early January, he'll come over. . . . Now, the thing is, with BioCube.

CM: So once he opens the account he's sending me free trading certificates, and then he does what he does.

CW: Now, since BioCube is going to happen before all that, then you put it wherever you got to put it, we'll wire the money wherever.

CM: This is what I'm going to do, as we're doing this process, I'll put more stock in my account and I'll just sell it from my account and I'll owe you the money, we'll figure out how to do it.

CW: If [   ] [         ] fsets it up, and the shares, you tell me when to sell it.

CM: When are you going to get the name of the entity?

CW: He hasn't called me.

In the foregoing portion of the meeting, I believe that MESSALAS first stated that "Boris" – a reference to the defendant BORIS RUBIZHEVSKY – owned $1 million in convertible BioCube

_____

[4]      Based on my experience, I believe that, by "info@," MESSALAS was referring to an email address that would begin with "info@" and end with the domain name, followed by ".com."

debt, half of which MESSALAS controlled, and that MESSALAS intended to convert some of that debt into BioCube shares and "cancel" or retire the rest of the convertible debt. I also believe that MESSALAS stated thereafter that the vast majority of BioCube stock was held by investors who would follow MESSALAS's instructions regarding stock purchases. MESSALAS then stated that he believed, as a result of the pump and dump scheme, the price of BioCube stock would increase to 20 cents a share (as compared to its share price of seven cents as of July 22, 2016). Messalas and the CW then discussed the defendant ██████████████ ████████████ and the plan for ██████████████ to set up accounts for the CW's shares.

32. On or about March 24, 2016, the CW consensually recorded another telephone call with the defendant CHRIS MESSALAS at the FBI's direction. During the call, MESSALAS and the CW discussed that the defendant ██████████████████ was still in the process of setting up an offshore account for the CW. The CW stated that ██████████████ said that he believed MESSALAS might be intending to rob the CW. MESSALAS responded: "What am I going to do, rob your money? I'm sorry, I've got other people to rob. I don't need to rob you."

33. On or about August 10, 2016, the CW consensually recorded another telephone call with the defendant CHRIS MESSALAS at the FBI's direction. MESSALAS and the CW had the following conversation relating to the offshore accounts set up by the defendant ████████████████████

> CM: I talked to the owner of Seton. I told you, I'm friends with the owner of Seton Securities.
>
> CW: Yeah, yeah, yeah.
>
> CM: . . . . And I had, I have a friend of mine in the Dominican Republic. Ok. That used to do business with a firm

21

Verdmont in Panama. And Verdmont got in trouble with the SEC. Ok, but then went back and sued the SEC and won, but they went out of business in the meanwhile. So, he's sitting, ok, with like 40 zillion clients and no way to trade them. So, I called up Seton and said let's get something together between the both of you and he'll be, I don't know if you know what they call it in Europe or outside the United States, introducing broker.

CW: Who would be that? You would be that or your friend in Dominican?

CM: My friend. . . . (UI) So I introduce him to Seton, put him on the phone with Seton. Now when I'm on the phone with Seton, Jay says "listen I'd love to do your fucking business, but one of the biggest problems is that when I get a cert, it takes me two months to clear it."

CW: Oh boy.

CM: Ok, so, so, wait the story gets better, which is why I want you to know what I'm saying to you. He says, "I don't want you to call me up every five minutes and ask me why your cert hasn't cleared, so I want you to see if you can get your certs DWAC eligible so I can take the cert."

CW: Got it.

CM: So that basically told me that I must be DWAC. Ok, that's number one. Not only because of him. Then I call Merit in Cyprus, and Merit calls me back and I speak to the head compliance and I say the same thing. "I have a group of guys, they need to be an introducing broker," blah blah blah, whatever. They said, "ok, can you give me a list of securities." So I gave them a list of like two NASDAQ national, a few fucking penny stocks [laughing] and they came back to me and they fucking told me, "Chris, we can clear this this this, but we can't clear any of the smaller stocks." And they didn't even give me the DTC, DWAC shit. So now, I don't know, maybe ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ has a relationship with them. You knew that I wanted to do a DWAC anyway. You'll probably see an 8-K go out by Friday saying that we're an unreporting company and then by Tuesday at the latest, that we're pink sheet compliant. I should be able to be DWAC by then.

22

Based on my training and experience, in this call, MESSALAS discussed how to make BioCube stock more easily tradeable on public markets, including by making the stock Pink Sheet compliant and "DWAC eligible."   Based on my training and experience, the DWAC system allows shares to be transferred electronically, without the physical transfer of stock certificates, and therefore more quickly and easily.   Accordingly, I believe that the steps MESSALAS discussed in this call were aimed at making it easier and faster for him and his co-conspirators to execute their scheme to fraudulently inflate the price of BioCube shares.

      34.    On or about and between October 17, 2016 and February 23, 2017, law enforcement authorities conducted a judicially-authorized wiretap of the defendant CHRIS MESSALAS's cellular telephone.   On or about October 17, 2016, MESSALAS called the defendant MICHAEL GARNICK and they had the following conversation relating to the BioCube stock manipulation scheme, in pertinent part:

CM:    Either late tomorrow or early Wednesday morning, I just talked to.

MG:    For what?   For what Chris?

CM:    For your forty grand.

MG:    (Laughs)

CM:    I'm not bull shitting, you know I coulda got away with six without.

MG:    Where is the six coming from?

CM:    I'm sending you forty, ok?   I sold fuckin' IUT stock.

MG:    I'm sorry say that again, you sold what?

CM:    I sold IUT stock. . . .

    I sold 40 thousand dollars' worth of IUT stock, ok, I told you I was going to do that, what do you call it – ah –

MG: Where is IUT stock for Admetus? I'm just curious, like, I know you you're in control of everything, but where is that? I'm just curious.

CM: We haven't issued it, ok, I sold stock that had from, just don't worry. I'm getting you your forty grand, we're gonna get a shit load of stock don't worry about that crap, why you get so fucking crazy? I'll get that done.

MG: Because, again I'm sitting here with no money, no emails, no paperwork, no construction of the deal.

CM: You can say that all you want.

MG: Nothing, nothing.

. . . .

CM: Dude I'm starting.

MG: You could even come to me and say.

CM: Listen, Mike, let me just get you the forty grand and stop arguing with me please, ok?

MG: Ok.

CM: I'm doing everything and by the way [a BioCube Director] finished the numbers, ok, so we're gonna be—

MG: Ok so what are we doing with the BioCube?

CM: No, no [the BioCube Director] finished with the numbers, I'm sending it over to the fucking attorney, ok, and getting everything ready, we're going to be able to file this week and deposit it.

I believe that, during this call, among other things, GARNICK acknowledged that MESSALAS controlled Admetus's stock by saying, "I know [] you're in control of everything."

35. On or about October 25, 2016, the defendant CHRIS MESSALAS called the defendant BORIS RUBIZHEVSKY and they discussed the timing of the BioCube pump and dump scheme. RUBIZHEVSKY asked MESSALAS, "[w]ell aren't you filing today or

tomorrow for BioCube?"   MESSALAS replied: "[y]es, that's what I'm saying, so I gotta get this fuckin' done. . . . Dude, I'm sitting with 27,000 with one guy, ok, another 400,000 shares, if I can get him out of that fuckin' stock dude that's like 50 grand we'll be able to play with." RUBIZHEVSKY responded, "[a]h man, so fuckin' desperate."

36.     On or about December 8, 2016, the defendant CHRIS MESSALAS called the defendant BORIS RUBIZHEVSKY and MESSALAS stated, among other things, that: "[w]e gotta get fucking BioCube moving. Okay and I gotta get us in the next slot.   I'm going to Canada Monday and I gotta know what I'm saying to these people."   RUBIZHEVSKY asked MESSALAS shortly thereafter, "[w]here's that trading you promised?"   MESSALAS replied: "[y]eah, yeah, yeah. You wait until you see the fucking trade."

37.     On or about December 23, 2016, the defendant CHRIS MESSALAS called the defendant BORIS RUBIZHEVSKY and they had the following conversation, in pertinent part:

> CM:    Garnick is going to shoot somebody. First they've said we didn't have the documents obviously, and you've sent me the documents, ok?   Then they said, "Whoa, this thing looks like a shell," so I sent them the 8-K saying about IUT and then I sent them the website and I sent them all the information. Now they're coming back and saying, "Well the note's for 50 grand and you've only sent 11."   So now I had to explain to them that we converted $11,000 worth of (UI). Ok, and that's why. And (UI), these people are just fucking idiots, I can't take it.
>
> BR:    Which one is it?
>
> CM:    This is not Alpine, if it was Alpine I would have had it done already. This is fucking Garnick, one of his friends, his trader for like fucking 20 years, and the guy knows his shit, but they clear through COR Clearing, and COR is the worst
>          . . . .

. . . .

BR:     Why don't you put Garnick there [with PennTrade], too?

CM:     No, no, I'm going to put Garnick, we have an account at Alpine, ok? Dude, ok? Alpine, my shit isn't clear yet, but it's already in the account and what did I start, a week ago? You think I want to deal with this shit? They didn't even present this to the broker. This is not even going through them yet.

BR:     Oh.

. . . .

CM:     . . . I'm tired. I can't. I had enough of these fucking, you think I fucking need to deal with this shit with Garnick? Garnick gives me a headache. You know what I mean? And I got to deal with his stupid fucking broker. And I told his broker four times, I said "dude, you're an asshole because if you figure out how to do this, I'll give you 50 clients, moron."

I believe that, during this call, MESSALAS discussed his conversations in furtherance of the

stock manipulation scheme with a "trader" used by the defendant MICHAEL GARNICK to

provide information relating to stock held by GARNICK.   Not only did MESSALAS say to

RUBIZHEVSKY that he gave the trader information about the stock, which I believe

demonstrates MESSALAS's control of stock owned by GARNICK, but also, MESSALAS and

RUBIZHEVSKY discussed other brokerage firms that would present fewer obstacles with

respect to the scheme than GARNICK's trader, including "Alpine," at which, MESSALAS

stated, "we have an account."   Based on my experience and participation in this investigation, I

believe "Alpine" was a reference to Alpine Securities Corporation, a broker-dealer firm.

        38.     On or about January 30, 2017, the defendant MICHAEL GARNICK

called the defendant CHRIS MESSALAS and they had the following conversation relating to the

BioCube pump and dump scheme and the involvement of an individual in public relations

("PR"):

> CM: Dude, the guy, the PR guy, has been pounding me.  Friday my . . .
>
> MG: Which one?  Amir?
>
> CM: No, for BioCube.  I have another guy that I'm doing the BioCube with. Ok and he . . .
>
> MG: Why aren't you getting the money from him for me--
>
> CM: Because I don't . . .
>
> MG: --And you.
>
> CM: 'Cause this is what I'm going to do.  You're going to deposit the stock.  I'm going to sell him a million fucking shares.  I'm going to sell him a half a million.  Dude, he's pounding me every day to sell him stock.
>
> MG: Go ahead, finish your sentence.  Half a million shares at what.
>
> CM: All right.  So, what do you call it, he's going to bring the stock up to ten.  Ok. Ten, ten, twelve, somewhere like that and then we'll sell him a half a million.  I'd rather do it like that than do any private that we don't have to.
>
> MG: Ten, twelve what?
>
> CM: Cents.
>
> MG: Yeah right.
>
> CM: All right.  Isn't it better I do it that way than have to do all the shit.  Do it right in your account.
>
> MG: So where are you getting that?  Out of our end?
>
> CM: Yeah.  Dude, we'll figure it out.  Let's just do it first.
>
> 39.   Also on or about January 30, 2017, the defendant BORIS

RUBIZHEVSKY called the defendant CHRIS MESSALAS.  During the call, MESSALAS

referred to pumping the price of a stock, and RUBIZHEVSKY later stated, "[w]ell, I'm hoping that you'll do the same, you know, with our stock so we can get something out of it, too," to which MESSALAS responded: "no I'm going to watch it, no, believe me . . . ," after which RUBIZHEVSKY laughed and said, "[o]k."

40.     On or about February 7, 2017, the defendant CHRIS MESSALAS called the defendant MICHAEL GARNICK and they discussed, in pertinent part, having GARNICK call an individual ("Broker 1") at Wilson-Davis & Co., Inc. ("Wilson-Davis"), a brokerage firm. After MESSALAS stated that GARNICK should call Broker 1, he and GARNICK had the following discussion, in pertinent part:

MG:     Now, let me ask you this question. He knows you're involved with BioCube, not Admetus, right?

CM:     I didn't tell him. I told him you're one of my friends, you run Admetus, and I told him—

MG:     Did you tell him what the stock was?

CM:     Yes, yes, but he was in his house. He knows the stock! He did the 15c. He told me, "Chris, as long"—

MG:     But he knows you're involved with BioCube?

CM:     He doesn't know to what extent, just don't, don't—

MG:     Look, I'm just asking. I'm not gonna say anything. I need to know what to say and what not to say, Chris, so just be a little patient, because I never know with you. I don't know, you have understand. I just want to make sure I don't say anything that I shouldn't say, or I do say certain things that I want to say. . . .

         Do I tell him when I open Admetus, the only thing I'm depositing at this point is BioCube?

CM:     Yeah, but you're gonna do more stuff, you know, "Chris tells me you're a great guy" —

28

> MG:    That's what I want to say, yeah give me a script, Chris, 'cause you know your act, you know your stuff and you've done a hundred million of these things and basically the first entity I'm getting in here is BioCube.
>
> CM:    Right, and Chris told me to use you . . . .

In the same call, GARNICK asked MESSALAS what to say to Broker 1 regarding a last name, which I believe, based on my participation in this investigation, is a reference to MESSALAS's close associate.   This discussion included the following exchange:

> MG:    If he or anybody in the future in compliance with that company happens to ask what's my relationship with [MESSALAS's associate] or whatever, can I just say—
>
> CM:    No, she's just a silent partner which is the truth by the way.
>
> MG:    A silent partner. You know they own half the fuckin' thing, so just give me something that's believable. That she was a client of mine?
>
> CM:    Yeah, you could say that.
>
> MG:    Any other ideas?
>
> CM:    Listen, I don't have to hide much from [Broker 1], he knows me a long time—I'm just worried about his compliance. Absolutely—
>
> MG:    Right, and I want to be consistent, that's all.   Um so if that comes up, what's the best answer?
>
> CM:    Just say, I mean, maybe it's a client, okay?   Or something like that.
>
> MG:    All right, all right.
>
> CM:    Don't worry, dude. He's good. You'll see.
>
> MG:    All right, give me his number.

In a subsequent text message also on or about February 7, 2017, MESSALAS sent GARNICK a telephone number for Broker 1.

### III. The Scheme To Launder Proceeds of the BioCube Stock Fraud

41. In or about and between October 2015 and April 2017, the defendants CHRIS MESSALAS, DIMITRIOS ARGYROS, also known as "Jimmy," and ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ together with others, engaged in a scheme to launder approximately $2 million in proceeds of the BioCube stock manipulation scheme through offshore nominee accounts. Pursuant to the scheme, MESSALAS, ARGYROS and ▮▮▮▮▮▮▮▮▮ agreed that the CW would pay MESSALAS to purchase BioCube shares, the shares would get transferred to an offshore nominee account set up by ▮▮▮▮▮▮▮▮▮ and the transactions would be papered to conceal the CW's ownership of the shares. In addition, on or about February 25, 2016, ▮▮▮▮▮▮▮▮▮ facilitated the wire transfer of approximately $24,965 from an overseas bank account to MESSALAS's U.S. bank account with the intent to promote the carrying on of the BioCube stock pump and dump scheme.

42. In or about October 2015, the defendant CHRIS MESSALAS told the CW that MESSALAS's cousin – whom the CW later understood to be the defendant DIMITRIOS ARGYROS, also known as "Jimmy" – could assist with setting up offshore accounts. MESSALAS ultimately put the CW in contact with the defendant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in order to help the CW begin the process of setting up an offshore account. MESSALAS provided the CW with a telephone number for ▮▮▮▮▮▮▮▮▮, and the CW called ▮▮▮▮▮▮▮▮▮ on or about November 10, 2015. During that call, ▮▮▮▮▮▮▮▮▮ expressed his unwillingness to discuss the matter over the phone and his preference for meeting in person.

43. On or about November 17, 2015, at the FBI's direction, the CW consensually recorded his meeting with the defendant DIMITRIOS ARGYROS, also known as

30

"Jimmy." During the meeting, in addition to discussing the BioCube pump and dump scheme,

ARGYROS told the CW that he had spoken to MESSALAS about the CW and explained that

████████████ could open bank and brokerage accounts outside of the United States,

specifically in Cyprus, which would conceal the CW's identity. ARGYROS stated the

following about his conversations with ████████████ in pertinent part:

> DA: If you don't do it properly, we're going to have problems.
> And we don't want to have problems, you understand? This
> is the problem, I mean, we can go and set up trusts, but if
> you're going to show, like, you're American, we're fucked,
> you know? ... This is the – it might cost a little bit more
> money, I don't know how much it's going to cost, we're
> going to figure out with him . . . . The way I spoke to him, it
> might be Cayman, it might be Cyprus, I don't know, he is
> going to figure out . . . but the bottom line, you and I are not
> going to show . . . .

ARGYROS also summarized his prior conversations with MESSALAS, as follows:

> DA: Chris was telling me, another thing we have to think about
> for security. The Canadian websites they don't allow the
> government to break in . . . . So he told me, it's a good thing,
> maybe we should open one in Canada with a dot.com,
> whatever it is, talk to him . . . I suggest it, because the other
> one, they can break in, you understand? Talk to Chris . . .
> this is about security for the email, you understand?
> Because we don't want to have back and forth over regular
> email. . . . [I]f you want to do it properly, maybe we should
> open something like that . . . build up a website in Canada,
> because it is secure and give you a business email, like an
> info-something . . . I'm just trying to prevent anything,
> because we don't want any linkage, because sometimes you
> send a wrong email, you understand?

In addition, ARGYROS stated that ████████████ would do "private papers" with the CW

because the CW "need[ed] to have a piece of paper," which I believe to be references to

papering the CW's and ████████████'s transactions with each other to give them the

appearance of legitimacy. ARGYROS also described the "ultimate goal" of laundering the

31

proceeds of the BioCube stock fraud as the CW's "gathering some assets overseas and then

retiring." ARGYROS told the CW that the CW could go overseas, "then you open an

account, you get a credit card, debit card . . . and they have the security, the cards, that you put

the money into the card – it's never linked the card to the account." In the same meeting,

ARGYROS also indicated his willingness and ability to capitalize on his anti-money

laundering expertise to help the money laundering scheme succeed. In pertinent part,

ARGYROS advised the CW, inter alia, not to send funds from his own company's accounts,

because that would be a "trace," elaborating as follows:

> DA: If you take $3,000 – if you bring $3,000 three times in the
> account, they [banks] will report you . . . three – three – three,
> because now you're going up to nine, it's consistent, round
> dollar . . . they [banks] put it all together. . . . [I]f you go, you
> with your own company, that's a flag . . . you understand . .
> . because now you're not consistent with what you said. . . .
> I read that if you have more than $50,000 in the account
> [offshore], you have to declare it to the IRS for the FATCA
> reasons . . . Yeah, FATCA is like all U.S. citizens have to
> declare all outside [offshore] money from the United States
> or otherwise they put you in jail and you have penalty.
> That's the new FATCA. It's a lot of bullshit. I'm telling
> you . . . and then they're going to send you a paper, asking,
> "are you a U.S. citizen?" And you say, "yes I am," so they
> have to release the paper to the U.S. government and IRS . .
> . so you understand, but there are some ways to do all this at
> the end.

44. On or about November 19, 2015, the defendant ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ sent the CW an email with the subject line "Business Development Services,"

providing the appearance of legitimacy to his participation in the money laundering scheme.

▮▮▮▮▮▮▮▮ wrote, in pertinent part, that it "has been a pleasure to discuss with you the

possibility to help you with Marketing & Business Development services in Europe as well as in

the Middle East Region." ▮▮▮▮▮▮▮▮▮ also suggested that he and the CW "meet up in

NY, which I think is more suitable so Jimmy can also join our meetings." The CW responded in an email the next day and suggested that he and ███████████████ meet in New York in early January 2016, and wrote that ███████████ could send him the invoice. On or about November 23, 2015, ███████████████ emailed the CW and attached an "invoice" from "███ ███████████████" – a company based in the United Arab Emirates – billing the CW $5,000 for "Advance Payment for Business Development Services." Based on my training and experience and participation in this investigation, I believe that the reference in the invoice to "business development services" was a reference to the conspirators' cover story for the anticipated money laundering transactions, designed to give the air of legitimacy to those transactions.

45. On or about January 11, 2016, at the FBI's direction, the CW consensually recorded his meeting with the defendant ███████████████████ in New York, New York. At the meeting, ███████████████ indicated that he already had had conversations with both defendants CHRIS MESSALAS and DIMITRIOS ARGYROS relating to the money laundering scheme. Also during the meeting, the CW discussed with ███████████ that the defendant CHRIS MESSALAS's scheme to promote BioCube stock would be the source of the funds the CW would launder into the offshore account(s) set up by ███████████ The meeting included the following conversation, in pertinent part:

> ███ Let me be honest with you, I had a meeting with [ARGYROS] . . . yesterday. Because on the phone you cannot share stuff. So we're very – when I talk to him, we don't go into any sensitive stuff. In the old times, I also used to talk to Chris [MESSALAS].

> ███ What's [MESSALAS's] specialty? Specialization?

> CW: I will say two things. Chris [MESSALAS] likes to be able

33

to form companies and deals.   And then he's able to through his connections in Canada, in Germany, possibly here, is able to provide a campaign—or just leave it at promotion. He's able to promote that company,

■:   and raise the—

CW:   raise the shares—

■   Three to 100—

CW:   Three to a dollar, and then sell before it collapses again.   So, we've done deals like that, we will continue to do deals like that, where you know, the company, some of the companies are crap, there's no question, they're crap ■ nodding his head], but we give them the money simply because we're buying stock at a cheap price, because we know whatever effort . . . guys like Chris [MESSALAS], we're gonna buy it at three [cents], sell it at a dollar, make two, three million dollars, and be done with it.

. . . .

We know we're buying [the stock] at three pennies.   We know through campaigns and manipulation and trading that the stock is gonna go up and we're gonna sell it.   That's the bottom line.   We're gonna buy it at three, sell it at a dollar, because of campaigns, manipulation, whatever.   But we're not gonna be involved in what they do, we just gonna know. That's all.

■   Ok.  This is clear.  Um, so what expectation do you have from me into this operation?

CW:   Yeah good.  Good question.  So what I expect is to have you form a company or two that is under my control but my name never appears, that our relationship is such that I trust you and that you're able to open a bank account and brokerage account, that you're able to sign the contracts when they come over to receive the shares.  You deposit the shares.  And that there's a way for me to communicate however we do this to sell those shares in that window before the stock goes down.  That's it.   And then some of the money can stay there, but some of the money I have to obviously live on and reinvest, that whole thing.

34

█ Clear.

In the same meeting █████████ summarized what he would do in the scheme as follows:

"[b]asically you will sell the shares to me. . . . And instruct the transfer agent to issue the shares

in my name. . . . So BioCube or another company um, there will be basically either cash

consideration or consultations . . . which consultations need to be documented."

████████ also discussed with the CW a cover story for their anticipated transactions,

which, based on my training and experience, I believe was for the purpose of giving the

transactions the appearance of legitimacy.   Specifically, ████████ said, <u>inter alia</u>:

> █ What I accept to do: you advise me where to invest, so I will
> invest. Now, if I will bill these guys, and have capital, and
> then you bill me to have the benefit of arranging the project
> – huh? – that's a different story. What I'm saying, it's good
> to say things on a way that is – if they ask you, "what are you
> doing with █████," you have to know what you are doing.
> You help me to find, to find companies here and invest. I
> want to make money . . . so I want to invest, maybe we
> should sign a contract saying that you will assist me find
> opportunities in the region of North America, for example,
> which is legitimate. You can advise me to do so. You can
> help me to find, you are not advising me, you are helping
> me, maybe there is a line here –

Also during the meeting, ████████ made the following statements, which I believe,

based on my training and experience and participation in this investigation, were an

acknowledgment by ███████ that the source of the funds to be laundered was a stock

manipulation scheme, and a reflection of ████████ sophistication, including with

regard to attempting to shield himself from law enforcement scrutiny:

> █ I can buy it [the stock], this is good.  Now, if it's going to
> be manipulated that means I'm part of it, I have – you know
> what I mean, if you are doing the wrongdoing, you are
> responsible, but if you don't know . . . .

CW:  [B]ut, you know it's being manipulated, but you are not
helping in the manipulation, what do you care?

████  I prefer not to know.  I prefer that I trust that you know the
opportunities, but if you keep saying it's manipulated, some
people are trying to cheat on others to buy the shares, I think
you're part of it, legally . . . . You know, why do I have to
know if they are crap companies.  All I want to know, will
they go up, so I buy.  I think that's what you would probably
do, that is what you should be concerned, to identify, based
on information that this share will go up because they are a
new company – I don't know if insider trading goes to this,
but I don't know, how can they prove that I have insider
information? – so buying it with the expectation that it will
be going up, and you sell.  Question is, how do I know when
to sell? . . . [S]omebody needs to give me the signal (smiles).

46.     On or about January 13, 2016, the CW consensually recorded his follow-

up meeting with the defendant ████████████████████████, at the FBI's direction.  At the

meeting, ████████████████ stated that he had met with both the defendants CHRIS MESSALAS

and DIMITRIOS ARGYROS separately while ████████████████ was in the United States on the

instant trip.  At the January 13, 2016 meeting, ████████████████ and the CW agreed that

████████████████ fee for assisting with laundering the CW's proceeds of the pump and dump

scheme would be 40 percent of the profits.  Toward the end of the meeting, ████████████████

told the CW to talk to Chris [MESSALAS]," but added, "don't talk to him on the phone about

these matters."

47.     On or about January 20, 2016, the CW consensually recorded his meeting

with the defendant CHRIS MESSALAS, at the FBI's direction.  MESSALAS and the CW

discussed the following about purchasing additional BioCube stock to be deposited in offshore

accounts through the defendant ████████████████████████████, in pertinent part:

CM:  First he ████████████████ needs some money to have so
he can buy stock.  He knew about BioCube.

36

CW:   I told him.

CM:   Yeah, yeah, he told me.   So I used BioCube as the example.

    . . . .

    We'll use BioCube so you understand.   Instead of you giving me a check, he would wire me 25 thousand.   I would send the stock to his company, he's the investor.   Say he sells that stock and gets, whatever, say a hundred thousand. He then, how do I get the money back, ok, I take some restricted stock that I own I sell it to him.   He wires me the money . . .

CW:   And now it's your money.

CM:   And now it's my money.

CW:   Free and clear.

CM:   Free and clear.   That stock that I sold to him, that's restricted, will now age . . . .

CW:   And does it again.

CM:   And does it again.

CW:   And how would I get restricted stock.

CM:   In deals that we do.

CW:   Got it.

    . . . .

CM:   You're going to sell him that piece, but not at a low price. You're going to sell it to him so you can bring the money in without, number one it's less taxes, and number two it cleans up whatever you're doing.

CW:   Yeah, yeah, yeah.   And he was ok with that.

CM:   Yeah, because dude how can you not be ok with that.   That works. That works.   Nobody can ask you any questions. See the way that he usually does it is that he does a consulting agreement.   Then you've got to prove that he came to see you.   What did he consult on?   God forbid

anybody asks you any questions, you've got to ask all these
questions. Why do you want to do that?

48.     On or about February 5, 2016, the CW consensually recorded a telephone
call with the defendant ████████████████████, at the direction of the FBI.   During the
call ████████████ stated that everyone had agreed that he would receive 30 percent of the
CW's profits in the pump and dump scheme as a fee for his participation in the money
laundering scheme.

49.     On or about February 9, 2016, the CW consensually recorded his text
message conversation with the defendant ████████████████████, at the direction of the
FBI. ████████████ sent two text messages to the CW in quick succession stating,
respectively: "AGITE FAMILY OFFICE LTD" and "Awaiting from you the details as discussed
to issue the invoice." Based on my participation in this investigation, I believe that Agite
Family Office Ltd was the name of an offshore entity ████████████ was using in furtherance
of the money laundering scheme.   Shortly thereafter, the CW provided billing information to
████████████ which ████████████ then used to create a new $30,000 invoice.
████████████ emailed the invoice to an FBI-controlled email account (which the CW had
provided to ████████████) on or about February 16, 2016.

50.     On or about February 18, 2016, the FBI wired $30,000 from an
undercover FBI account in the Eastern District of New York, the name of which the CW had
discussed previously with the defendant ████████████████████, to an offshore account
identified by ████████████. Based on my participation in this investigation and
information provided by the CW, I believe that $5,000 of that amount was a fee for
████████████, and the remaining $25,000 was to be used by ████████████ – after

moving it from his bank account to an "Agite" corporate account in Dubai – to purchase from Messalas additional BioCube shares. On or about February 25, 2016, \$24,965 was wired from a Mashreq Bank account in Dubai, United Arab Emirates, in the name of "Agite Ltd Offshore," located at Al Jazeera Blg, Al Mari Area, Ras Al Khaimah Free Zone, PO Box 31291," to Mashreq Bank PSC in New York, New York, to a Blackwater Capital Markets Limited account at Citibank in the United States. The address associated with the Blackwater account was "20 Carlton Pl" in Staten Island, New York. The notation for the transaction was "PURCHASE OF SHARES AS PER AGREEMENTFEBRUARY [sic] 9TH 2015."

51.    On or about March 15, 2016, the CW consensually recorded, at the direction of the FBI, an electronic message the defendant ███████████████ sent the CW via the "Telegram" application. ███████████ had instructed the CW to use Telegram for purposes of communicating with ███████████. Based on my experience and knowledge of this investigation, I am aware that Telegram allows users to adjust their settings to opt for self-destructing messages or messages that are automatically deleted after a short period of time. The March 15, 2016 message from ███████████ read as follows:

> Sorry I missed to contact you yesterday but I am now travelling and was with clients out for dinner. As for the project we are now in the process to open the regular bank account in CY [Cyprus] after we open in Dubai. We shall then apply for a brokerage account to deposit the share certificate which we have not yet received from Chris [MESSALAS]. Should I contact him directly or you know about it?

The CW responded via Telegram, "[p]lease contact him," to which ███████████ replied, "[o]k will do on Thursday when I am back in office And will update you."

52.     On or about June 28, 2016, the CW consensually recorded a meeting with the defendant DIMITRIOS ARGYROS at the direction of the FBI.  During the meeting, ARGYROS and the CW again discussed the BioCube pump and dump scheme and that it was the source of the funds to be laundered; specifically, the CW stated that the defendant CHRIS MESSALAS: "is going to do what Chris does, right?  He's going to move the stock to $0.50, to $1.00. . . . He's going to do his promotion, his pump, whatever you want to call it. He's going to get the stock going. And then we need to liquidate."   ARGYROS told the CW, in substance, that the defendant ██████████████████ was in the process of opening the offshore accounts, including an account in Cyprus, and that ████████████ needed another week. ARGYROS said that "Agite" was the name of the relevant offshore company, that he was speaking with ████████████ every day, and "pushed him, too," to set up the accounts, telling ████████████ "'you have to move.'"  ARGYROS also described what the CW could do once the CW's share of the proceeds of the BioCube pump and dump scheme were laundered, as follows: "I mean, the bottom line is, when you're set up – let's say you make half a million – you can leave it and trade, you understand? And you don't have to be bothered. And then you go to the Cayman Islands, have a trip, pick up some money."   ARGYROS also explained to the CW that he (ARGYROS) was "the paperwork guy," and that ████████████ "must receive the shares, send them back, take off the legend, deposit it."   When the CW stated that he thought ARGYROS was part of MESSALAS's company Blackwater, ARGYROS responded as follows:

> DA:     I work with him [MESSALAS]. But, you see, the issue with me, I cannot put my name anywhere, it's a risk for me – I can't put it in the company, because it's a conflict of interest. So, let's say I would get a job at in JPMorgan they said, "are you a director or someone in the company" and then they're going to say, "give me the other company and we'll want to

> do investigations" – you understand? . . . I almost lost a
> contract like that. Yeah, yeah, they wanted to throw me out.

During the same meeting, the CW discussed with ARGYROS the anticipated $2 million in

proceeds from the sale of the CW's BioCube shares after the completion of the fraudulent pump

of BioCube stock. The CW told ARGYROS that ███████████ was to receive a 30 percent

share of such proceeds, explaining that ████████████: "is going to make 30 percent of

whatever, right. So if you have two million shares, let's just say Chris [MESSALAS] is going to

do his promotion to a dollar, he ███████████ is going to make $600,000."

         53.     On or about July 22, 2016, at the FBI's direction, the CW consensually

recorded a conference call with the defendants DIMITRIOS ARGYROS and ████████

████████.    During the call, ████████████ confirmed that, pursuant to the scheme,

two offshore nominee accounts had been opened in the name of a "so-called investor" or

nominee named Andrikos. ████████████ explained that one of the accounts was in

Limassol, Cyprus and one was in the Bahamas (with Seton Securities). ████████████

identified the brokerage firm in Cyprus as Merit. ████████████ also instructed the CW that

the defendant CHRIS MESSALAS "needs to deliver stocks for which he has been paid," and that

the stocks should be sent to the entity that bought them, at which point that entity would be

responsible for liquidating/selling or buying the shares.    During their discussion about the

BioCube pump and dump scheme, ████████████ stated, "well ahead of the liquidation there

should be clear instructions at what level this is going to happen and then there's a matter of

execution."    The CW also mentioned on the conference call the anticipated $2 million in

proceeds from the sale of his BioCube shares after the completion of the fraudulent pump of

BioCube stock.    Specifically, the CW said MESSALAS "needs until the end of the September,

41

because, he said, 'the stock is going to go from three cents [$0.03] to either fifty cents [$0.50] or

a dollar [$1.00],' you know, look at the numbers.   At a dollar, we're sitting at $2.2 million and,

obviously, 30 percent of that is going to be you guys, so there is a significant amount of money

there, right?"

        54.     On or about July 25, 2016, the CW consensually recorded, at the direction

of the FBI, a text message exchange with the defendant ███████████████ , which

included the following messages:

        ████   AGITE LTD Reg Number: A330/04/14/8425 P.O. Box
                    31291 ,Al Jazeera, Al Hamra, Ras Al Khaimah, United Arab
                    Emirates

        ███ :   spoke to J and I suggest you meet to discuss the process

        ███ :   before you meeting I will discuss again processes in much
                    more detailed

        CW:   Ok will do. I need the brokerage acct names I know one is
                    Seton Securities. The other I think you said merit?

        ███   See J [reference to Argyros] so we get things crystal clear to
                    move on as discussed

        ███   I want to reduce written communication in regards to this as
                    much as possible

        CW:   Ok

        55.     On or about September 12, 2016, at the direction of the FBI, the CW

consensually recorded his meeting with the defendant DIMITRIOS ARGYROS.   During the

meeting, ARGYROS told the CW, "[y]ou can do money into the fund and then they are going to

invest it."   While discussing the "investor" associated with the offshore account set up by the

defendant ███████████████ – whose name was used instead of the CW's – ARGYROS winked and smiled at the CW, which, based on my training and experience and knowledge of this investigation, I believe was an acknowledgment by ARGYROS that he was discussing the conspirators' cover story for the offshore nominee account.  ARGYROS also discussed the process of depositing the BioCube stock certificate and said that he wanted Agite to send in the paperwork.  ARGYROS and the CW also discussed adding blue chip stocks to the offshore account to create the appearance of the account's legitimacy, which ███████████ previously had encouraged.  The CW also again mentioned to ARGYROS the anticipated approximately $2 million in proceeds from the sale of the CW's BioCube stock after the completion of the fraudulent pump.  Specifically, the CW said, "once it's ready – Chris [MESSALAS] is going to do his pump and dump, whatever he does, whatever – I'm going to bring in some more guys, and I'm going to bring the stock to a dollar, it's going to be $2 million, $3 million . . . ."

56.  On or about January 6, 2017, the defendant DIMITRIOS ARGYROS called the defendant CHRIS MESSALAS and they discussed MESSALAS's need to find the stock purchase agreement to give to the CW.  MESSALAS and ARGYROS stated the following, in pertinent part:

CM:  I can't find the fucking stock purchase agreement.

DA:  I'll get it for you.

CM:  Please get it for me, because malaka [jerk-off] I don't want to, I don't even have the name, malaka.

DA:  Because you don't remember anything. It's good you have a back office, me, for everything.

CM:  Yeah thank God.

43

57.     On or about January 18, 2017, the CW consensually recorded his text message conversation with the defendant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, in which the CW first stated: "I just spoke w [the defendant CHRIS MESSALAS]. He needs an address in Cypress for Agite Ltd. that's all. Can that be done." ▮▮▮▮▮▮▮▮▮ thereafter sent text messages in response that stated: "yes," "will send it to you here," "ANDRIKOS KOULOUNTIS address: LEOFOROS OMONIAS 53B, LEMESOS 3052, CYPRUS tel. +35799615999," and "need courier to keep an eye on the package."

58.     In text messages the CW consensually recorded at the direction of the FBI on or about January 31, 2017 and February 16, 2017, the defendant ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ notified the CW of the possibility that the offshore brokerage accounts would be closed soon "due to inactivity." In the latter text message, ▮▮▮▮▮▮▮▮▮▮ "propose[d] the following: 1) activate the accounts deposit 25K USD in each account and start trading 2) Our fees to prolong services till Jan 2018: 5K USD + 2.5K to pay my associates who assist (investor & others). If you agree we may prolong our agreement for another year[.]" The CW responded that he accepted ▮▮▮▮▮▮▮▮▮▮ proposal.

59.     On or about February 22, 2017, "▮▮▮▮▮▮▮▮▮▮" at ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ sent an email to the CW attaching another invoice for $57,500 for "[a]dvance payment for business development services in the Middle East region for 12 months."

60.     Based on my training and experience and participation in the investigation, the CW's ensuing text message conversations in approximately early March 2017 with the defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and DIMITRIOS ARGYROS, also known as "Jimmy," demonstrated their eagerness to continue with the money laundering scheme.

44

61.    In approximately early March 2017, at the direction of the FBI, the CW

consensually recorded a text message conversation with the defendant DIMITRIOS ARGYROS,

in which ARGYROS first asked the CW: "[d]id you rectify with ███," which I believe to be

a reference to the defendant ███████████. The CW responded, "I am working

on it as we speak." ARGYROS then replied, "Ok."

62.    Shortly thereafter, in or about early March 2017, the CW had the

following text message exchange with the defendant ███████████, which the

CW consensually recorded at the direction of the FBI:

███    Hello [CW]!

CW:    Hello who is this

███    ██████ :)

CW:    Ah. How are you

███    Having dinner with Jimmy
       All OK with you?

CW:    Very nice tell him I said hello and tell him let me know when
       he comes back to New York so we can meet
       All is well making arrangements to pay off that invoice

███    Lost you and worried!
       Stay in touch!

## III.    CONCLUSION

WHEREFORE, based on the foregoing, your deponent respectfully requests that

arrest warrants be issued for the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY,

MICHAEL GARNICK, DIMITRIOS ARGYROS, also known as "Jimmy," and ████████ ████████████ so that they may be dealt with according to law.

Because public filing of this document could result in a risk of flight by the defendants CHRIS MESSALAS, BORIS RUBIZHEVSKY, MICHAEL GARNICK, DIMITRIOS ARGYROS, also known as "Jimmy," and ███████████████████, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrants issued in connection with this complaint, be filed under seal, except that the government be permitted to share copies of the complaint and arrest warrant for ██████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

Dated:  Brooklyn, New York
        April 10, 2017

        ████████████████████████████
        CHRISTOPHER M. DONOHUE
        Special Agent, FBI

Sworn to before me this
_10_ day of April, 2017

████████████████████████
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK